IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
FEBRUARY 23, 2012 Session

**THE ESTATE OF NOEL C. HUNT, III, H. WAYNE GRANT, EXECUTOR
v. TRISHA L. JOLLEY HUNT**

**Direct Appeal from the Chancery Court for Hamilton County**
**No. 10-0718, Part II     Jeffrey M. Atherton, Chancellor**

_____

**No. E2011-01563-COA-R3-CV-FILED-MARCH 15, 2012**

_____

Appellant Estate sought declaratory judgment against Appellee widow for return of proceeds from the widow and Decedent's jointly filed federal and state tax returns. The Estate contends that, under an Antenuptial Agreement entered by and between Decedent and Appellee, the income tax refunds were Decedent's separate property, which thus belong to the Estate. Appellee widow contends that the filing of a joint tax return transmuted the separate property into marital property and, in the alternative, that a tenancy by the entirety was created in the tax refunds. The trial court found that, although the tax refunds were Decedent's separate property under the Antenuptial Agreement, part of those proceeds should, nonetheless, pass to the wife. We conclude that the filing of a joint tax return does not create a property right, and that a tenancy by the entirety was not established. Consequently, as Decedent's separate property, the tax refunds should have been awarded to the Estate. Reversed and remanded.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Reversed
and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Steven W. Grant, Kathleen V. Gibson and John P. Konvalinka, Chattanooga, Tennessee, for the appellant, The Estate of Noel C. Hunt, III, H. Wayne Grant, Executor.

Marvin B. Berke and Megan C. England, Chattanooga, Tennessee, for the appellee, Trisha L. Jolley Hunt.

**OPINION**

Noel C. Hunt, III ("Decedent") died on May 15, 2008. He was survived by his wife, Appellee Trisha L. Jolley Hunt. At the time of his death, Decedent and Mrs. Hunt had been together for approximately eighteen years, although they had only been married for two of those years. Decedent was diagnosed with cancer approximately two years before his death. Because he had a taxable estate, Decedent contacted his lawyer and proceeded to undertake measures to reduce the size of his gross estate. As a result, Decedent set up a trust account, into which Decedent's IRA account funds were wired. After the funds were wired to Decedent's trust account, some of the funds were paid directly to the Internal Revenue Service as an estimated tax payment toward Decedent's income tax liability. At no time were any of the funds deposited into a joint account, nor were any payments for estimated federal or state income tax paid from a joint account.

Prior to their marriage, Decedent and Mrs. Hunt entered into an Antenuptial Agreement dated September 5, 2006. As will be discussed in greater detail below, the Agreement provides that "[a]ll wages, [and] earnings . . . from . . . any . . . source before and during the marriage shall remain the separate property of each party . . . ." The Agreement further contemplates that the parties may file a joint income tax return: "Nothing in the Agreement shall be construed as waiving (i) any right of the parties to report their income for federal or state income tax purposes in the same manner as permissible for any other husband and wife . . . ." It is undisputed that Decedent and Mrs. Hunt filed a joint tax return for the year 2007. Moreover, it is undisputed that the 2007 refund check was mailed to Mrs. Hunt's home and that she deposited it into a joint account. Mrs. Hunt testified that Decedent was deceased at the time she received the 2007 refund.

After Decedent's death, the 2008 federal and state income tax returns (which are the subject of the instant appeal) were filed as joint tax returns. However, it is undisputed that, at the time of the 2008 filing, Mrs. Hunt had very little income and no withholding from any source. The refund derived from the State of Tennessee was $552.00; the refund derived from the federal tax return was $33,658.00. Believing that these tax refunds were property of the Estate of Noel C. Hunt, III (the "Estate," or "Appellant"), the Executor thereof, H. Wayne Grant, made demand on Mrs. Hunt to endorse the refund checks over to the Estate. When Mrs. Hunt refused, Mr. Grant filed this declaratory judgment action on behalf of the Estate on August 10, 2010. The complaint specifically sought a declaration regarding the rights and obligations of the parties with respect to the 2008 tax refunds, and asserted that the refunds were property of the Estate.

On August 23, 2010, Mrs. Hunt filed her answer and counterclaim, asserting that she was entitled to the tax refunds. The Estate filed its answer to the counterclaim on September 3, 2010, denying that Mrs. Hunt was entitled to the refunds. The case was heard on February 24, 2011. The trial court entered an order on June 29, 2011, awarding Mrs. Hunt "that

portion of the State of Tennessee and IRS tax refund based upon one hundred sixty five (165) days of the year over a total number of three hundred sixty five (365) days (or 45.2% thereof) . . . and the balance passing to the Estate." The trial court's memorandum opinion was incorporated, by reference, into the June 29, 2011 order. We will discuss the memorandum opinion more fully below.

The Estate appeals, raising one issue for review as stated in its brief:

> Whether the trial court erred in awarding a portion of the 2008 state and federal income tax refunds to [Mrs. Hunt] despite finding the existence of a valid and enforceable Antenuptial Agreement.

In the posture of Appellee, Mrs. Hunt contends that the trial court erred when it failed to find that the Decedent and Mrs. Hunt held the tax return checks as tenants by the entirety, and further erred when it divested Mrs. Hunt of this alleged jointly-held property.

The rights of the parties concerning tax refunds and other sources of income are set out in the Antenuptial Agreement. When interpreting antenuptial agreements, we employ the same principles of construction that are applicable to other written contracts. *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996).[1] Ultimately, the court's task is to discern and to honor the intent of the contracting parties. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975); *Wilson*, 929 S.W.2d at 373. "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002).

In ascertaining and giving effect to the contracting parties' intentions, where the parties have reduced their agreement to writing, courts look to the parties' intentions as reflected in the language of contract itself. *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). "The intent of the parties is presumed to be that specifically expressed in the body of the contract . . . ." *Planters Gin Co.*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Bob Pearsall Motors, Inc.*, 521 S.W.2d at 580. Where the language of the contract is clear and

---

[1] Tennessee public policy favors antenuptial agreements. *Perkinson v. Perkinson*, 802 S.W.2d 600, 601 (Tenn.1990). Parties benefit from antenuptial agreements because such agreements define their marital rights in property. *See Sanders v. Sanders*, 288 S.W.2d 473, 477 (Tenn. Ct. App. 1955).

unambiguous, its literal meaning controls the outcome of contract disputes. ***Planters Gin Co.***, 78 S.W.3d at 890. Stated another way, where terms of the agreement are clear and unambiguous, the courts must wholly ascertain the parties' intent from the plain and ordinary meaning of those terms. ***Bob Pearsall Motors, Inc.***, 521 S.W.2d at 580; ***Ballard v. North American Life & Casualty Co.***, 667 S.W.2d 79, 82-83 (Tenn. Ct. App. 1983); ***Sutton v. First Nat'l Bank***, 620 S.W.2d 526, 530 (Tenn. Ct. App. 1981). Neither party has raised an issue concerning the validity of the Agreement on grounds of ambiguity. From our review of the entire Antenuptial Agreement, we conclude that the language used is clear and unambiguous.

The trial court's findings of fact are presumed correct unless a *de novo* review of the record produces a preponderance of evidence to the contrary. Tenn. R. App. P. 13(d). However, no such presumption of correctness is afforded to the trial court's conclusions of law. ***Angus v. Western Heritage Ins. Co.***, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). The question of interpretation of a contract is a question of law. ***Guiliano***, 995 S.W.2d at 95. Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. ***Id***.; ***Angus***, 48 S.W.3d at 730. Rather, this court must review the document in light of the foregoing principles, and must make an independent determination regarding its meaning and legal import. ***Hillsboro Plaza Enters. v. Moon***, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

Turning to the Antenuptial Agreement, Paragraph 2.3 thereof provides that:

> All wages, earnings and accumulations resulting from personal services or any other source before and during the marriage shall remain the separate property of each party, except to any extent to which such amounts are placed by the party entitled to them in a joint account with the other party. . . .

Paragraph 2.4 of the Agreement further provides that:

> All other property and interests in property acquired by either party before and during the marriage, by gift, inheritance, purchase or otherwise, together with all replacements to any separate property and all income, capital gains, and liquidating and extraordinary distributions from any such separate property, shall, except as may be otherwise provided in this Agreement, remain the separate property of the party acquiring such property or in whose name the property is placed.

In its memorandum opinion, the trial court specifically held that"[i]t [sic] doesn't

-4-

appear to be any question but that Exhibit 1, Antenuptial Agreement, is a valid and binding agreement between the parties." Neither party has raised an issue concerning the validity of this holding; consequently, we proceed on the conclusion that the Antenuptial Agreement is, in fact, valid and binding.

As set out above in Paragraphs 2.3 and 2.4 of the Antenuptial Agreement, the list of what constitutes separate property is very broad, including basically all sources of income and all property from any source so long as the income or property can be traced to the individual party. Accordingly, the Agreement contemplates that all property and income will remain separate property unless "such amounts are placed by the party entitled to them in a joint account with the other party." In its memorandum opinion, concerning the 2008 tax return, the trial court specifically held that "[t]he income [from the 2008 tax returns] clearly came from, with the exception as noted earlier, separate property of the deceased."[2] From our review of the record, there is no dispute as to this finding. The question, then, is whether the tax refunds, which "clearly came from. . .separate property of the deceased," were transmuted into marital property by virtue of the fact that Decedent and Mrs. Hunt filed joint tax returns, by virtue of having been held jointly (as Mrs. Hunt argues, as a tenancy by the entirety), or by virtue of waiver under Paragraph 11.3 of the Antenuptial Agreement, which provides:

> Any waiver of a right under this Agreement must be expressly made in writing, and no delay by either party shall operate as a waiver by the other party; no single or partial exercise of a right shall preclude a later exercise of the right or another right; and no express, written waiver of a right on one occasion shall constitute a waiver of another right.[3]

---

[2] The "exception noted earlier" refers to the $86,737 in "wages, salaries, tips, etc.," which is part of the total income of $734,099 reflected on the 2008 federal income tax return. Although wage earnings would usually be considered marital property, in the instant case, the Antenuptial Agreement, at Paragraph 2.3 thereof, clearly states that wages will remain separate property unless placed in a joint account.

[3] "[S]eparate property may be deemed marital by operation of law under theories of commingling or transmutation." *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002):

> If the separate property continues to be segregated or can be traced into its product, commingling does not occur.... [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property.... The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also

(continued...)

From our review of the record, there was no argument or finding that either party to the Agreement expressly waived any right pursuant to Paragraph 11.3. Although the trial court acknowledged this fact in its oral ruling, it went on to state that:

> What's challenging for me at this point is section 11.3 in the Antenuptial Agreement relating to waiver. Because it's the Court's inclination to let the pattern of practice that the parties had exhibited relating to the 2007 refund apply to the 2008 refund, or refunds. And of that total, my inclination is to basically award to the Estate dividing it by 365 days, because if you passed away on May 15th, means 165 days of that refund to the Estate–excuse me–to the Defendant [i.e., Mrs. Hunt] and 200 days to the Estate.

The court continued:

> I mean, it's based primarily on his income. It is the equity of the situation that leads me to a decision that if it was good enough in 2007, it should be good enough in 2008. But from a purely legal perspective, not taking into consideration the equities, my ruling would be that the Antenuptial Agreement stands and that [Mrs. Hunt] would not be entitled to anything; because simply filing a tax return does not change the underlying nature of the funds–the income that was generated. But I can't ignore the 18 years between the parties. I can't ignore the prior practice that took place in 2007. And so that's my rul[ing].

Equity is not triggered in this case as the proof is insufficient to support the trial court's finding of a "pattern of practice" based solely upon the fact that the 2007 tax returns were deposited into a jointly held account. As noted above, although the Decedent and Mrs.

---

[3](...continued)
> upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt,* 81 S.W.3d at 747 (quoting 2 Homer H. Clark, The Law of Domestic Relations in the United States §16.2 at 185 (2d ed. 1987)).

Hunt filed joint tax returns for the year 2007, by the time the refund checks arrived, Mr. Hunt was deceased. Consequently, the fact that Mrs. Hunt deposited the checks into a joint account cannot provide the basis for a pattern of practice between the parties as this act was clearly unilateral on the part of Mrs. Hunt. The Antenuptial Agreement is clear and unambiguous and no waiver of its provisions is found in the record. Consequently, under Tennessee Code Annotated Section 36-3-501, the trial court was bound to enforce the terms of the Agreement:

> [A]ny antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

Because the source of the tax refunds in 2008 were traced (undisputedly) to Decedent's separate property, under the plain language of the Antenuptial Agreement, the tax refunds remain the Decedent's separate property unless transmuted, as a matter of law, by joint filing or by joint tenancy. We now turn to address these grounds.

## Joint Filing

As noted above, the Antenuptial Agreement provides that it shall not be construed as "waiving (i) any right of the parties to report their income for federal or state income tax purposes in the same manner as permissible for any other husband and wife . . . ." We construe this language to allow Decedent and Mrs. Hunt to file joint income tax returns as husband and wife, without the joint filing affecting the provisions of the Agreement concerning separate and marital property. The question, then, is whether a joint filing transmutes the tax return into marital property as a matter of law. We conclude that it does not.

Tennessee law is sparse in this area; consequently, we first turn to the Internal Revenue Code, 26 U.S.C.A. § 6013 (2003), which provides, in relevant part, as follows:

> (a) Joint returns.--A husband and wife may make a single return
> jointly of income taxes under subtitle A, even though one of the

spouses has neither gross income nor deductions, except as provided below: . . .

In J. R. Kemper, Annotation, *Right of Surviving Spouse to Tax Refund Resulting from Joint Income Tax Return*, 67 A.L.R.3d 1038 (1975), Mr. Kemper discusses the purpose of 26 U.S.C.A. § 6013 as follows:

> As has been noted by the courts in several cases, § 6013(a) of the Internal Revenue Code of 1954, which authorizes a husband and wife to file a joint federal income tax return even though one of them had no income of his or her own, was enacted in order to put taxpayers throughout the country on an equal basis by permitting couples in common–law states to split income between themselves and thus to diminish their tax liability in the same manner as couples were able to do in community property states wherein each spouse was deemed entitled to one–half of all income irrespective of the amount earned by or accruing to each.[***McClure v. United States***, 228 F.2d 322 (4th Cir. 1955); ***Bertucci v. United States***, 146 F. Supp. 949 (U.S. Ct. of Claims 1957)].]
>
> On the other hand, it has also been generally recognized that Congress did not intend § 6013(a) to affect or change the ownership of property rights between taxpayers, and that as a consequence the filing of a joint federal income tax return does not automatically convert the interest of one spouse in any refund due thereunder into a joint interest therein with his or her marital partner. [***In re Wetteroff***, 453 F.2d 544 (8th Cir. 1972), *perm. app. denied* 409 U.S. 934 (1972), *reh den* 409 U.S. 1050 (1972) (citing ***In re Illingworth***, 51 Am. Fed. Tax R. 1512 (D.C. Or. 1956), 56-2 USTC ¶10004 ("The Government in making a tax refund makes no attempt to determine what part of such refund should belong to the recipients to decide how such refund shall be divided or used.")].

The majority of caselaw from our sister states holds that the filing of a joint tax return does not, *ipso facto*, result in transmutation of separate property into marital. For example, in ***In re Carson's Estate***, 199 A.2d 407 (N.J. Super. 1964), the widow of a decedent and his executor filed a joint federal income tax return as permitted under Section 6013(a) of the Internal Revenue Code. The return listed the income of both the decedent and the widow, but while there were tax credits arising out of withholding payments on the

decedent's earnings, there were no credits attributable to the income of the widow. As in the instant case, the New Jersey court was asked to determine whether the proceeds of the refund check should go to the widow or should be included in the decedent's estate. It was urged, on behalf of the widow, that because she was liable for any underpayment of taxes shown to be owing on the joint return, she should be the recipient, in part at least, of any overpayment. Overruling such assertion and holding that the entire amount of the check should go into the decedent's estate, the court noted that Section 6013 of the Internal Revenue Code was enacted in order to equalize the tax burden for married persons in all states, whether they were residents of community property states or not, and it was not intended to deal with ownership rights between taxpayers. *Id*. at 408. Refuting the further contention that the provisions of the Internal Revenue Code stipulating that refund checks might be made payable to a husband and wife served to support the instant widow's claim, the court declared that there was nothing in the Code provisions, nor in the Treasury Regulations issued thereunder, which indicated that the widow would be entitled, under federal law, to the benefits of the overpayment. *Id*. at 409. Based upon this analysis, the court reasoned that the ownership rights to the overpayment of taxes were not changed by the filing of a joint return by the widow and the executor, and that since no evidence had been presented to contradict the assertions and proof that the sole ownership of the overpaid funds was in the decedent, his estate was rightfully entitled thereto. *Id*. at 410.

A similar result was reached by the Wisconsin Supreme Court in *In re Estate of Trecker*, 215 N.W.2d 450 (Wis. 1974). In *Trecker*, the Wisconsin court specifically addressed the question of whether a spouse, who is a party to an antenuptial agreement, is entitled to assert a claim against the deceased spouse's estate for a federal income tax refund. Relying upon *In Re Illingsworth*, *supra*, the court held that the filing of a joint tax return did not create a right under federal law in the widow to an interest in a refund where there was no substantial income or deductions attributable to the surviving spouse. *Trecker*, 215 N.W.2d at 452. The Wisconsin Court explained that:

> The law, while providing such benefits and the concomitant liabilities from filing a joint return did not-as the appellant contends-create any property rights in the jointly filing spouses. It is firmly established that the existence of any property rights in a tax refund resulting from the filing of a Federal Joint Income Tax Return is determined under state law. The mere partaking in a federally created administrative taxation procedure, i.e., joint return-does not result in the creation of substantive property rights.

*Id.* at 450. In other words, "[w]hile filing a joint income tax return does create a joint and

several liability for underpayment, there exists no concomitant joint and several right to the refund therefrom." *Id*. at 452. In addition to the majority of our sister states, our federal courts have likewise held that filing a joint tax return does not create property rights. *See, e.g.*, *In re Colbert*, 5 B.R. 646 (S.D. Ohio 1980) (holding that the non-income producing spouse has no property interest in the income tax refund, even though same was filed jointly with the earning spouse); *In re Boudreau*, 350 F. Supp. 644 (D.C. Conn. 1972) (stating that a wife who did not work during the taxable year did not contribute to the income during that year was not entitled to proceeds from a jointly filed tax return).

Based upon the foregoing, we hold that the filing of joint income tax returns does not create any property right in the jointly filing spouse as a matter of law.

### Tenancy by the Entirety

Mrs. Hunt contends that the refund checks at issue here were held by the Decedent and Appellee as tenants by the entirety; therefore, Mrs. Hunt contends that she is entitled to the full refund amounts as the surviving spouse. We disagree.

The United States Bankruptcy Court for the Middle District of Tennessee has examined the question of whether a tax refund issued to a Tennessee debtor and his wife was held in tenancy by the entirety. *In re Larish*, 149 B.R. 117 (M.D. Tenn. 1993). In *Larish*, the court held that, under Tennessee law, the refund was not property held by the debtor and his wife as tenants by entirety. *Id*. at 120. In reaching its decision, the *Larish* Court reasoned that:

> It is well established in Tennessee that the creation of a tenancy by the entirety requires the coincidence of four unities: "[t]he unity of interest, the unity of title, the unity of time, and the unity of possession; or, in other words, joint tenants have one and the same interest, accruing by one and the same conveyance, commencing at one and the same time, and held by one and the same undivided possession." *Preston v. Smith*, 41 Tenn. App. 222, 293 S.W.2d 51, 59 (1955) (quoting *Bennett v. Hutchens*, 133 Tenn. 65, 179 S.W. 629, 631 (1915)).
>
> Applying Tennessee law, the filing of a joint tax return does not by itself convert Mr. Larish's entitlement to a tax refund into a tenancy by the entirety. The creation of tenancy by the entirety requires an instrument of conveyance containing proper words of conveyance and demonstrating intent to transfer the grantor's interest into entireties property. *Hutchison v.*

> **Board**, 194 Tenn. 223, 250 S.W.2d 82, 84 (1952). There is no conveyancing instrument here. A joint tax return lacks any operative words of conveyance and does not, without additional language, constitute an instrument of conveyance. **In re Baker**, 82 B.R. 461, 463 (Bankr.S.D. Oh. 1987); **Wetteroff v. Grand (In re Wetteroff)**, 453 F.2d 544, 547 (8th Cir. 1972), cert. denied, 409 U.S. 934, 93 S.Ct. 242, 34 L.Ed.2d 188 (1972).

**Larish**, 149 B.R. at 118. Likewise, in the instant case, the joint tax returns lack any operative words of conveyance. We know, from the foregoing principles, that the filing of a joint tax return does not change the underlying nature of the funds, nor does a jointly filed return create any property rights in the refund. It is well settled in Tennessee that the creation of an estate by the entireties is a question of intent; it may be inferred from circumstances, but should rest upon convincing evidence and never upon conjecture. *See **Lamberth v. S & L Plumbing Co., Inc.**, 935 S.W.2d 411, 412 (Tenn. Ct. App. 1996). Consequently, in order to find a tenancy by the entirety in the tax refunds, there would have to be proof of the Decedent's intent to transfer some property right to Mrs. Hunt. However, as correctly noted by the Appellant, it was the Executor and Mrs. Hunt's decision to file joint tax returns in 2008 because the Decedent was deceased at that time. It is axiomatic that there can be no conveyance of any property right as the Decedent, being deceased, could not have formed the intent to transfer property rights in the tax refunds to his widow.

For the foregoing reasons, we reverse the order of the trial court. The case is remanded for such further proceedings as may be necessary and consistent with this opinion, including, but not limited to, the full amounts of both the state and federal income tax refunds being made property of the Estate. Costs of this appeal are assessed against the Appellee, Trisha L. Jolley Hunt.

_____
J. STEVEN STAFFORD, JUDGE